THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                No. Cr. 19-4445 JH

ANDRE DESHAWN COLEMAN
and ZAVIER MALIK JETER,

      Defendants.

**MEMORANDUM OPINION AND ORDER**

      This matter comes before the Court on the following motions: (i) *Motion to Suppress Evidence Derived from a Telephone "Dump" of his Cellular Telephone and Statements and Memorandum in Support Thereof* (ECF No. 39) filed by Defendant Andre Deshawn Coleman ("Coleman"); (ii) *Motion to Suppress Evidence and Memorandum in Support Thereof* (ECF No. 40) filed by Defendant Coleman and Defendant Zavier Malik Jeter ("Jeter"); and (iii) *Motion to Suppress Evidence Derived from his Unlawful Arrest, the Subsequent Violation of his* Miranda *Rights and from an Illegal Seizure of his Cellular Telephone* (ECF No. 68) filed by Defendant Jeter. The Court held an evidentiary hearing on the motions on June 3, 2021. The Court, having considered the motions, briefs, arguments, evidence, law, and otherwise being fully advised, concludes that Defendants' *Motion to Suppress Evidence and Memorandum in Support Thereof* (ECF No. 40) should be denied because the detention of the tractor trailer for purposes of an administrative search was constitutional and did not exceed the scope of a proper search. The Court, however, will grant in part Defendants' motions (ECF Nos. 39 and 68) and suppress statements they made to law enforcement following their clear and unambiguous requests for

counsel and the contents of their iPhones, discovered as a result of the failure to scrupulously honor their requests for counsel, but will otherwise deny the motions to suppress.

## I.     FACTUAL BACKGROUND

A federal grand jury charged Defendants with conspiracy to distribute 1,000 kilograms and more of a mixture and substance containing a detectable amount of marijuana from on or about November 17, 2019, and continuing to on or about November 19, 2019, in violation of 21 U.S.C. § 846 (Count 1), and with possession with intent to distribute 1,000 kilograms and more of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), and 18 U.S.C. § 2 (Count 2). (Indictment, ECF No. 19.)

### A.     The Truck Inspection

The charges stem from the inspection of a tractor trailer on November 19, 2019 at the New Mexico Commercial Motor Vehicle Port of Entry near Gallup, New Mexico ("Gallup port of entry"), which is located about 12 miles east of the Arizona/New Mexico state line on Interstate 40. (*See* June 3, 2021 Hr'g Tr. (hereinafter "Hr'g Tr.") 17:7-11, 20:14-22:4.) All commercial motor vehicles that are not registered with the State of New Mexico are required to come into the port of entry to get checked to make sure they can travel across the state without having to pay for a trip permit. (*Id.* at 22:15-20.) Commercial vehicles with Drivewyze and PrePass, however, are not required to come into the port of entry, unless there is a discrepancy and they are red lighted. (*See id.* at 22:21-24:14.) Commercial trucks that pull up to the port of entry come through and stop at the credential booth, but if they do not need a trip permit or inspection, they are waved through the port of entry. (*See id.* at 24:19-25.)

Miranda Pinto ("Pinto"), a transportation inspector with the New Mexico State Police ("NMSP") commercial vehicle enforcement, was working at the Gallup port of entry on November

19, 2019. (*See id.* at 16:6-17, 38:6-7.) As a transportation inspector, Pinto's duties include ensuring the safety of commercial vehicle drivers and their equipment and enforcing the rules and regulations to which commercial motor vehicle drivers must abide. (*See id.* at 17:21-18:3, 30:8-17.) Pinto received training to perform various forms of inspection, including North American Standard classes for Level I, II, and III inspections. (*See id.* at 18:4-19:16, 25:18-29:4.) Pinto also received training on drug interdiction. (*Id.* at 89:6-8.)

The Commercial Vehicle Safety Alliance ("CVSA") is a group that sets the North American Standards for the different levels of inspection, which the transportation inspectors are required to follow. (*See id.* at 28:6-24.) Level I inspections are the most thorough, consisting of an inspection of the driver's logbook, all the driver's paperwork and supporting documents, the lighting, tires, cargo securement, and brakes. (*See id.* at 25:23-27:12.) In contrast to a Level I inspection, the Level II inspection does not consist of the brake measurements, but it is otherwise basically the same as the Level I inspection. (*See id.* at 27:13-25.) A Level III inspection mainly consists of checking the driver's paperwork and making sure the log-in device is up to date and his supporting documents are in his possession. (*See id.* at 28:1-5.)

As a transportation inspector, Pinto has a daily quota of inspections to conduct in a shift: five Level I inspections in a day; six Level II inspections in a day; or eight Level III inspections in a day. (*See id.* at 20:1-9.) She is generally assigned a certain inspection level for the day, but she may shift to a different inspection level based on time constraints in what is left for her shift. (*See id.* at 29:3-17.) Level I inspections often take her 45-60 minutes to complete. (*See id.* at 29:11-14.) Pinto chooses which truck to inspect at random by picking up the phone and asking for the next truck coming down the lane. (*See id.* at 25:4-14.)

On November 19, 2019, Inspector Pinto was assigned to do Level I inspections, but she

was running out of time at 2:15 p.m. to finish her last inspection to meet her quota by the end of her shift. (*See id.* at 38:4-39:1, 88:5-7.) At approximately 2:15 p.m., a white tractor trailer driven by Coleman entered the Gallup port of entry. (*See* Hr'g Tr. 38:4-39:14; Gov.'s Ex. 6B.) Pinto called the booth and said to send the tractor trailer to her in Bay 1, but because of the time left in her shift, she turned the Level I inspection into a Level II inspection. (*See* Hr'g Tr. at 38:6-39:9.) She chose the truck because it appeared nice and clean and she expected to conduct the inspection quickly and leave her shift on time. (*See id.* at 40:6-15.) When the truck pulled into the bay, the inspection bay rear door closed, so the truck was not free to leave. (*Id.* at 91:8-12.) The cab of the truck was marked with "VinJet Logistics, LLC" with its USDOT number. (*See* Gov.'s Ex. 6C; Hr'g Tr. 141:11-15.)

Pinto explained to Coleman that she was going to do a Level II safety inspection and the process, and she asked for his required documents and if he had a co-driver. (*See* Hr'g Tr. 39:19-20, 43:17-44:3, 45:18-21.) Although Coleman did not answer the first time, the second time she asked, he said his co-driver was asleep. (*Id.* at 39:19-22.) She asked again a later time because she noticed a movement in the cab of the truck and thought his co-driver must be awake. (*See id.* at 39:19-40:2.) She later learned that Jeter, who was 24 years old at the time, was the co-driver. (*See id.* at 39:15-40:2, 220:3-5.)

Pinto reviewed Coleman's paperwork, checking the logbook and bills of lading to ensure there were no inconsistencies. (*Id.* at 44:6-45:11.) Coleman's signature was on a Bill of Lading dated 11-14-19 for a U-Haul pick-up of one box described as "General Commodities." (Gov.'s Ex. 3A; Hr'g Tr. 69:11-70:11.) A second Bill of Lading for a U-Haul shipment of three boxes of "General Commodities" had a blank space under "Carrier Signature at Pickup," which was unusual because drivers are expected to sign off on the bill of lading when they pick up the cargo. (*See*

4

Gov.'s Ex. 3B; Hr'g Tr. 71:2-72:11, 131:11-132:16.) A third Bill of Lading listed a shipment of dehydrated cornmeal and stainless-steel cans from Sacramento, California, dated 11-15-19, which was signed by the carrier. (*See* Gov.'s Ex. 3C; Hr'g Tr. 73:2-74:16.) A fourth Bill of Lading showed a shipment from El Monte, California, and was signed with a pickup date of 11/18/2019. (*See* Gov.'s Ex. 3D.) The Bill of Lading listed 0401957 as the seal number and described the commodities as a shipping crate of steel finishing bars, set clamps, canvas, binding pins, transfer trays, and torque bar. (*Id.*; Hr'g Tr. 75:12-76:25.) The final Bill of Lading listed U-Haul general commodities shipping from Sacramento, California, to Columbia, South Carolina, and was signed by Zavier Jeter on 11/18/19. (*See* Gov.'s Ex. 3E; Hr'g Tr. 77:17-78:25.) Generally, the bill of lading with the earliest date corresponds to cargo that is placed in the trailer closest to the cab, and the bill of lading with the most recent date corresponds to cargo closest to the back of the trailer near its door. (Hr'g Tr. 79:6-23.) At this point in time, Pinto believed the bills of lading and logbook appeared in order and Coleman had a valid commercial driver's license. (*Id.* at 106:16-23.)

After reviewing the paperwork, Pinto explained to Coleman about starting her walk-around inspection, going down the left side of the vehicle, to the back, and then up the right side of the vehicle. (*See id.* at 45:16-47:10.) During the walk around, Pinto checked the lights, tires, wires, air lines, and electrical lines. (*Id.*) Around 25 minutes into the inspection, Coleman opened up the side box on the tractor so Pinto could check the emergency equipment and spare fuses, and she discovered that he did not have any spare fuses, which are used to replace lights that go out. (*See id.* at 47:11-48:5.) Pinto found a roll of plastic wrap in the side box. (*Id.* at 48:6-49:3.)

Although for a Level II inspection the CVSA requires the check of seatbelts, coupling devices, steering mechanism, suspension, and air loss rates, Pinto did not check those items during

her inspection of the tractor trailer. (*See* Hr'g Tr. 93:12-95:24, 97:11-15.) She did, however, check other items such as the lights, exhaust system, fuel system, windshield wipers, horn, saddle tank, and blinkers. (*See id.* at 93:94:3-96:12, 97:16-98:1, 98:21-25.) Although the CVSA recommends that a Level II inspection should take no longer than 20-30 minutes, Pinto did not begin the physical inspection until about 20 minutes into the inspection. (*Id.* at 97:1-9.)

Pinto returned to her desk and asked Coleman questions about the several bills of lading. (*See id.* at 49:9-50:4.) Next, Inspector Pinto conducted a commodity check, a standard part of the Level II inspection involving opening the trailer to verify that the cargo was adequately secured and had not spilled. (*See id.* at 32:19-33:20, 51:7-11.) Pinto told Coleman that they were going to remove the bolt to check the contents of the load, and at this point, Coleman started acting nervous. (*See id.* at 51:7-14.) Coleman asked if it was necessary, and she replied that it was because it was part of the inspection. (*Id.* at 51:15-20.)

Pinto explained that she was matching the seal number to the bill of lading and she was going to cut the seal and replace it with one of theirs. (*Id.* at 55:20-25.) The seal number matched the bill of lading signed with a carrier pick up date listed as November 18, 2019. (*Compare* Gov.'s Ex. 2, *with* Gov.'s Ex. 3D. *See also* Hr'g Tr. 68:20-69:7.) Coleman acted very nervous at this point: his eyes darted back and forth, his hands were moving a lot, and he was sweating. (Hr'g Tr. at 56:18-23.) Pinto and her colleague used bolt cutters to cut the bolt seal. (*See id.* at 57:10-59:4.) Coleman opened the right-side door to the trailer, and Pinto noticed a very strong odor of marijuana. (*Id.* at 59:9-60:15.) Pinto asked him if there was anything that he shouldn't have in there, and Coleman replied that he did not know what was in there, that he just picked up the trailer, and that everything was already in there. (*Id.* at 60:16-61:5.) Pinto, however, had examined the bills of lading and knew that his signature was on a bill of lading. (*Id.* at 61:6-9.) Pinto asked a

colleague for assistance, and she asked Coleman to open the left door, which he did by retrieving the key from the cab and using it to open the lock. (*See id.* at 61:12-63:10, 104:23-105:23.) Pinto got into the trailer and saw two or three pallets in a row with boxes. (*Id.* at 64:9-22.) At that point, she could not see what the boxes contained, but smelled a strong odor of marijuana based on her drug interdiction training. (*Id.* at 112:1-24.) The wooden box nearest the trailer door was wrapped in plastic wrap as was the crate in the middle. (*See id.* at 142:2-144:20; Gov.'s Ex. 6D, 6F, 6G.)

Shortly thereafter, Pinto summoned NMSP Lieutenant Scott Armstrong ("Armstrong") who detained Coleman in handcuffs at about 2:56 p.m. while they searched the trailer and cab. (*See id.* at 65:2-66:11, 122:9-11.) Armstrong then called out for the co-driver twice, and Jeter calmly emerged from the truck. (*See id.* at 66:19-67:21, 123:5-6.) Armstrong placed Jeter in handcuffs around 3:02 p.m. and called in several officers to check the cab, take pictures, and help unload. (*See id.* at 67:18-24, 123:18-21, 134:7-12.) NMSP Inspector Emilio Griego ("Griego") arrived to assist searching the tractor trailer. (*Id.* at 136:12-139:19.) Officers began searching and photographing items in the tractor trailer around 4:11 p.m. (*See id.* at 161:7-163:10.) Griego could smell marijuana in the trailer. (*Id.* at. 139:12-22.) Officers discovered 2,656 pounds of marijuana in crates and cardboard boxes. (*See id.* at 145:5-147:25, 244:17-24; Gov.'s Ex. 6H, 6I, 6J, 6L, 6M, 6N, 6O.)

Officers searched the cab and found a bottle of tequila that had been opened, and some marijuana in a glass jar taken from a camouflage bag. (*See* Hr'g Tr. 148:1-149:2; Gov.'s Ex. 6P, 6Q, 6R.) Officers also found Jeter's commercial driver's license and a roll of plastic wrap under the bottom bed in the cab that was consistent with the plastic wrap around the crates in the trailer. (*See* Hr'g Tr. 151:13-153:19; Gov.'s Ex. 6S and 6T.)

Pinto finished her inspection around 9:00 p.m. that evening. (Hr'g Tr. 133:22-134:6.) She

listed three violations for Coleman as the driver in her Driver/Vehicle Examination Report: no spare fuses in possession as required, driver on duty and in possession of marijuana, and driver in possession of a bottle of tequila with a broken cap. (*See* Gov.'s Ex. 5; Hr'g Tr. 80:20-85:13.) Coleman refused to sign the inspection report. (*See* Gov.'s Ex. 5; Hr'g Tr. 80:25-82:11.)

### B.   Interviews of Coleman

Shortly before 4:30 p.m., Griego separately informed Coleman and Jeter of their *Miranda* rights and they signed respective *Miranda* Warning Notices at 4:25 p.m. and 4:28 p.m., respectively. (Hr'g Tr. 155:14-158:24; Gov.'s Ex. 7A, 7B, and 7C.) The advice of rights notified them of their *Miranda* rights, including the right to remain silent and the right to talk to a lawyer. (Gov.'s Ex. 7B and 7C.) At that time, officers did not ask if they wished to give up their rights. (Hr'g Tr. 164:6-17.)

Officers at that time told Coleman what the potential charges against him might be. (*See* Gov.'s Ex. 7A at 1:58-2:32.). Coleman said, "Let me ask you a question. Can I … *Can I call my wife and try to get a lawyer or something* because I'm just trying to figure out why you're gonna charge me when … I can see if I had it on me on my person but I didn't have it on me … you can talk to the shipper, that's who put it on there, not me." (*Id.* at 2:48-3:05 (italics added)). Griego responded, "We'll get there when we do. Right now, we're gonna check that all the drugs unloaded…. Ok. Alright, well, if we have questions, then you know your rights, ok." (*Id.* at 3:04-3:19.) Coleman then asked questions about what to do, and Griego responded that they were waiting to see the quantity of drugs. (*See id.* at 3:19-3:42.) Griego did not allow him to make a call to a lawyer. (Hr'g Tr. 165:3-16.)

NMSP Senior Patrolman Marcus Lopez ("Lopez") was notified of the investigation and was going to be the lead agent for the case if it remained a state case, so he traveled from

Albuquerque to the Gallup port of entry. (*See id.* at 174:13-179:23.) Lopez interviewed Coleman and Jeter separately in a conference room with another agent. (*Id.* at 180:10-181:3.) The officers' sidearms were holstered during the interview, and they offered Coleman and Jeter food and bathroom breaks. (*Id.* at 181:6-24; Gov.'s Ex. 8A.)

At about 9:50 p.m., Lopez interviewed Coleman and began by getting his identifying information. (*See* Gov.'s Ex. 8A at 0:20-1:50.) Coleman had been in handcuffs since approximately 2:42 p.m., and when he asked if they could be taken off, Lopez said he had to have them on. (Hr'g Tr. 207:16-208:18.) Lopez asked if he remembered earlier when an officer read his *Miranda* rights and asked if he understood those rights, and Coleman replied, "yeah," and that he did not do anything wrong. (Gov.'s Ex. 8A at 1:50-2:20.) Lopez, however, did not ask him if he would agree to give up those rights and talk to him. (Hr'g Tr. 208:9-11.) Coleman said that he hooked up a sealed trailer and began driving. (Gov.'s Ex. 8A at 1:50-2:20.) Lopez asked again if he understood his rights and had any questions about his rights, and Coleman replied, "No." (*Id.* at 3:55-4:11.) Lopez asked, "And we can continue talking? Do you agree?" (*Id.* at 4:10-:13.) Coleman responded, "Yes." (*Id.* at 4:10-:19.) Lopez began asking Coleman questions about the trip. (*See id.* at 4:19-4:33.) Coleman stated that, after dropping off the tractor trailer, he rented a car to hang out with friends for the weekend and that the copies of rental paperwork were on his phone. (*See id.* at 9:40-10:13.) When asked if there was contraband in the cab, he initially said no before saying there was a small amount of marijuana in his camouflage bag that he bought for someone else. (*See id.* at 25:10-25:50.)

Coleman maintained he did not know what was in the trailer. (*See id.* at 38:13-:36.) When asked if there was anything on his phone that would show he knew, Coleman replied, "Hey, go get the phone and look through the phone yourself. I'm giving you permission to look through the

phone right now. Do whatever you feel like doing." (*Id.* at 38:53-39:03.) He repeated he had nothing to hide and would allow agents to access his phone: "Just go through the phone and do whatever you want to do." (*Id.* at 39:03-39:23.) Agents then looked through Coleman's phone in his presence and discussed certain messages and photographs with him. (*See* Hr'g Tr. 187:17-189:10.) A few minutes later, Coleman asked to use the restroom and agreed that an agent could continue to review the phone while another took him. (*See* Gov.'s Ex. 8A at 47:22-47:40.) When Coleman returned, agents continued to question him. (*See id.* at 49:30-1:09:34.) Agents ensured he had enough water and a candy. (*See id.* at 1:09:49-1:09:55.) Agents later questioned Coleman about inconsistencies between his story and Jeter's. (*See id.* at 1:17:45-1:20:35.) This interview lasted about an hour and a half. (Hr'g Tr. 208:19-23.)

At around 12:30 a.m., agents interviewed Coleman again for approximately 21 minutes after he had been sleeping. (*See* Ex. 11A; Hr'g Tr. 214:10-13.) He was still in handcuffs. (Hr'g Tr. 212:5-22.) Agents reviewed the contents of Coleman's phone with him, among other questions. (*See* Hr'g Tr. 213:9-214:1.)

Around 1:30 a.m., Lopez woke up Coleman and said they needed him to unlock the phone because they were taking his phone for evidence and they were going to get some search warrants. (*See* Gov.'s Ex. 14A at 4:10-4:31; Hr'g Tr. 202:2-10, 214:17-22.). Lopez asked, "Can you unlock this so I can turn it off?" (Gov.'s Ex. 14A at 4:30-4:34.) Coleman asked whether they were going to get a search warrant for his phone, and Lopez responded affirmatively. (*See id.* at 4:39-4:41.) Coleman unlocked the phone, placed it in airplane mode and turned it off. (Hr'g Tr. 202:18-203:7.) Agents did not search the phone further at that time. (*Id.* at 203:8-9.)

C.      **Interviews of Jeter**

At around 9:10 p.m., Lopez's first interview with Jeter began. (*See* Gov.'s Ex. 10A at 0:00-

0:12; Hr'g Tr. 182:17-183:9.) Jeter was still in handcuffs. (Hr'g Tr. 218:9-11.) Lopez asked if Jeter

had gotten something to eat, and he said no, he was not hungry. (Gov.'s Ex. 10A at 0:34-0:41.)

Lopez confirmed he had something to drink and had been allowed to use the restroom, and Jeter

responded that he was fine. (*See id.* at 0:40-0:52.) Lopez asked if Jeter remembered having his

rights read by another officer and if he understood them, and Jeter said he understood his rights.

(*Id.* at 2:14-2:24.) Lopez explained why they were detaining him and said that if he wished to talk

to him, he can, but if he doesn't want to, that's totally up to him. (*Id.* at 2:25-2:52.) Jeter asked,

"As far as, uh, as far as asking for a lawyer…," and Lopez replied, "Yes, that's included in those

rights." (*Id.* at 2:50-2:54.) Jeter responded, "Yes sir, um, how long, uh, is the wait for that?" and

explained that he had never been in trouble before. (*Id.* at 2:54-3:03.) The agent noted he did not

have any criminal history and said, "You know what, if you, if you asked for a lawyer and I'm not

even sure they are going to arrest you, ok. We're just here to get a statement from you." (*Id.* at

3:03-3:30.) Jeter said he understood as his brother is a cop. (*Id.* at 3:27-:28.) Lopez replied, "I

haven't been told that you've been placed under arrest yet…. They call it investigative detention."

(*Id.* at 3:30-3:37.) Lopez then said, "If you want to talk to me, I have a few questions, you can

answer 'em; if you don't want to, then, you know, this is, we're done." (*Id.* at 3:42-3:51.) Jeter

replied, "Yes, sir." (*Id.* at 3:50-3:51.) Lopez then explained:

> I can't tell you, like, how long it's gonna take you. If you get arrested, what they'll
> do is they'll book you for charges … into the local PD, or local jail. … You'll get
> arraigned. Maybe, what's today? Tuesday. … Maybe tomorrow morning. Maybe
> tomorrow afternoon you'll get arraigned. … And then they'll ask you then if you
> can afford a lawyer or if you need a lawyer appointed for you if you're indigent, all
> that stuff. … So…if you are arrested … it might be tomorrow afternoon, … for a
> lawyer.

(*Id.* at 3:52-4:30.) Jeter then asked, if he is not arrested, how he would he get home. (*See id.* at

4:28-4:37.) Lopez inquired if he had cash or a credit card, and when Jeter said he had a debit,

Lopez said he could drop him off at the bus station. (*Id.* at 4:38-4:47.) Jeter said he understood. (*Id.* at 4:47-4:52.) Lopez then asked, "Alright. So you're cool for talking to me?" (*Id.* at 4:52-:56.) Jeter replied, "Yeah," and Lopez clarified, "You wanna answer my questions?" (*Id.* at 4:55-:59.) Jeter responded, "Yes, sir." (*Id.* at 4:48-5:00.)

Lopez then began asking Jeter questions about their trip. (Hr'g Tr. 183:16-21.) Jeter said he did not know about the marijuana. (*See* Gov.'s Ex. 10A at 15:15-15:30.) Lopez subsequently discussed that Jeter had no criminal history, but Coleman did, and speculated that Coleman was thinking that Jeter can go down for this because he would only get probation. (*See id.* at 22:50-23:20.) Later in the interview, another agent suggested Coleman was ready to point the blame on Jeter, which was not true at that point. (*See* Hr'g Tr. 225:17-25.) The agent asked Jeter if there was anything in his phone that would say he was up to something he shouldn't be. (*See* Gov.'s Ex. 10A at 35:55-36:03.) Jeter replied no. (*See id.*) The agent then asked if Jeter would mind if they checked his phone. (*Id.* at 36:02-36:08.) Jeter replied, "Nah, I got you. Uh, I wouldn't mind. I mean, as far as, uh, as far as, uh, a lawyer being around, so I don't you know. 'Cause I know I'm saying a lot of stuff. And I don't wanna…" (*Id.* at 36:08-36:16.) The agent replied, "That's up to you" and said he would not search it illegally. (*Id.* at 36:18-36:21.) Agents did not search the phone; instead, they questioned him some more. (Hr'g Tr. 184:20-185:17.) Lopez later said he wanted to get this straight, "when he asked you to look in your phone, you said no without a lawyer, right?" (*Id.* at 40:56-41:02; Hr'g Tr. 186:2-6.) Jeter replied, "Yes, sir." (Gov.'s Ex. 10A at 41:01-:02.) Agents did not search the phone at that time. (Hr'g Tr. 186:7-8.)

Agents interviewed Jeter a second time around 11:30 p.m. to discuss discrepancies in who drove on what days. (*See* Hr'g Tr. 195:6-196:2; Gov.'s Ex. 13A and 13B.) Jeter was still in handcuffs. (Hr'g Tr. 232:9-15.) Approximately 15 minutes into the second interview, Jeter said he

told the agents everything that they wanted to know, and that "if you don't believe me, that's fine, … I'd rather just have a lawyer if y'all don't believe me, like, you can sit here and check the drive time…." (Gov.'s Ex. 13A at 15:39-15:49.) Agents asked about the log, and they continued discussing the drive time. (*See id.* at 15:51-16:56.)

Later, agents discussed how they found information in Coleman's phone. (*See id.* at 28:22-29:47.) They asked if he could show them something in his phone to show that Coleman was with him that weekend. (*See id.* at 30:09-30:28.) Jeter replied that the agent can check. (*See id.* at 30:30-30:38.) When asked if he used a car and Coleman used a rental car, Jeter responded, "I'm about to show you, hold on." (*Id.* at 30:38-30:58.) Jeter showed them some photographs on his phone and an agent asked, "So you're going to let me go through this? That's a yes or no?" (*Id.* at 30:59-31:21.) Jeter said, "You got it in your hand," but the agent replied that he needed some verification. (*Id.* at 31:21-31:26.) Jeter responded, "Go through the phone, please." (*Id.* at 31:25-31:28; Hr'g Tr. 198:20-199:3.) Agents then looked through the phone with Jeter. (Hr'g Tr. 199:13-16.)

Agents decided to take the phones, so they briefly conducted a third interview with Jeter, who was still in handcuffs, on November 20, 2019 around 1:30 a.m. (*See* Hr'g Tr. 201:4-5, 239:10-12; Gov.'s Ex. 14A at 0:00-0:09 and Ex. 14B.) Agents informed Jeter, "We're gonna take your phone. Can you unlock it for me?" (Gov.'s Ex. 14A at 0:11-0:17.) At the agent's command, Jeter placed both phones on airplane mode and powered them off. (Hr'g Tr. 201:8-202:1.)

**D.    Consent to Search Forms for Phones**

Agents transported Defendants to the offices of Homeland Security Investigations (HSI) in Albuquerque where they arrived about 4:35 a.m. on November 20, 2019. (*See* Hr'g Tr. 217:11-15, 245:12-20, 260:25-262:4.) Once in HSI custody, their handcuffs were removed. (*See id.* at 264:16-22.) HSI Special Agent Victor Avila ("Avila") assisted in the processing of Coleman and Jeter

when the federal government adopted the drug trafficking case from NMSP. (*See* Hr'g Tr. 240:9-241:1, 243:24-245:8.) During processing, Coleman was advised of his *Miranda* rights by HSI and he signed a *Miranda* waiver form that stated he understood his rights and was "willing to answer questions without a lawyer present." (Hr'g Tr. 245:21-247:20; Gov.'s Ex. 15.) Jeter, however, requested a lawyer with HSI agents and did not sign the *Miranda* waiver form. (Hr'g Tr. 247:24-248:8, 268:3-269:8.)

Avila also read to Coleman a "Computer Forensics Consent Worksheet," a standard form used in drug trafficking investigations, which Coleman signed on November 20, 2019. (*See* Hr'g Tr. 249:6-250:21; Gov.'s Ex. 16A.) The consent form stated: "I have also been informed of my right to refuse to consent to such a search." (Gov.'s Ex. 16A.) By signing the form, he authorized HSI "to conduct a complete search of all computer/electronic equipment located at HSI AIB" and to search any computers and other electronic storage devices, including cellular telephones. (*Id.*) At the time, the phone was in the room, and Coleman provided his passcode for it. (Hr'g Tr. 250:10-251:5.) The same day, Jeter also signed two of the identical "Computer Forensics Consent Worksheet" forms, consenting to the search of his phones, one for his Samsung Galaxy and one for his iPhone. (*See* Gov.'s Ex. 16B and 16C.). For the iPhone, Jeter gave his passcode to the agents when signing the form. (*See id.*; Hr'g Tr. 251:13-253:16.)

Most of the drug trafficking cases Avila has been a part of involve the seizure and/or search of an electronic device. (Hr'g Tr. 242:21-243:1.) He estimated the percentage to be in the high 90% range. (*See id.*) Had Coleman or Jeter not filled out the forms, the next step for Avila, as the processor, would have been to tell the case agent, and the case agent would have applied for a warrant to get the phones. (*Id.* at 253:19-24.) The typical, standard protocol for HSI drug trafficking investigations is, if a suspect refuses to sign the consent to search form for his phone,

the next step is to get a warrant for the phone, submit it to a judge, and then search the phone. (*See id.* at 253:25-255:7.) HSI has software agents use to access the contents of the phones. (*Id.* at 254:6-9.) The software can more easily get into Galaxy phones than iPhones. (*Id.*) In this case, no agent started the process for applying for a search warrant for the phones. (*Id.* at 265:24-266:3, 269:10-14.)

## II.    ANALYSIS

### A.    Standing

According to the Government, Defendants have not shown any evidence indicating they had a privacy interest in the contents of the trailer. Moreover, it contends that any seizure of Defendants lacks a factual nexus to the search, because if Defendants were free to go, Inspector Pinto could still inspect the truck and trailer. Defendants, however, argue that they have standing to challenge the search of the trailer based on their agency or employment relationship with the company in control of and with an interest in the trailer.

At the hearing, Defendants proffered facts regarding the issue of standing, to which the Government did not object. (Hr'g Tr. 271:21-274:17.) Consequently, for purposes of deciding the standing issue for these motions, the Court considers that Coleman and Jeter were employed by VinJet, VinJet owned the tractor and trailer, VinJet leased the tractor and trailer, Jeter was working for VinJet, and Jeter was appropriately licensed, qualified, and using the equipment at the point in time he was stopped. (*See* Hr'g Tr. 272:1-274:17.)

Fourth Amendment rights are personal, so a defendant may only challenge a search or seizure when his own Fourth Amendment rights have been violated. *United States v. Johnson*, 584 F.3d 995, 999 (10th Cir. 2009). To determine if a defendant has a protectable privacy right under the Fourth Amendment, courts consider (1) if the person manifested a subjective expectation of

privacy in the area searched, and (2) if society is willing to recognize that expectation as objectively reasonable. *Id.* Defendant has the burden of establishing his personal rights were violated under the Fourth Amendment. *United States v. Abreu*, 935 F.2d 1130, 1132 (10th Cir. 1991). Important factors to consider include ownership, lawful possession, or lawful control of the place searched. *Id.* at 1133. Courts consider a defendant's privacy interests in a trailer separately from his interests in the truck to which the trailer is attached. *See United States v. Kopp*, 45 F.3d 1450, 1452 (10th Cir. 1995); *Abreu*, 935 F.2d at 1133. Although a defendant's ownership of the truck and physical linkage between the truck and trailer are factors to consider, those facts do not necessarily confer standing. *See id.* at 1452-53; *see Abreu*, 935 F.2d at 1133. A court may consider whether the defendant had "an ownership, employment, or agency relationship with any entity or person that had an interest in the trailer." *Abreu*, 935 F.2d at 1133.

VinJet owns the tractor and trailer and employed both Coleman and Jeter who were working for the company at the time. Coleman also possessed a key to the door of the trailer, which was attached to the truck. The Court is therefore inclined to find Defendants have standing as to both the tractor and trailer.[1]

Moreover, because they occupied the truck at the time of the stop, they have standing to suppress evidence found in the trailer if the stop and continued detention were unconstitutional. Indeed, a defendant may "contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal detention." *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000). The defendant must show first that his detention violated the Fourth Amendment, and then, that there is a factual nexus between the illegality and the challenged evidence. *Id.* Only after the defendant makes these two showings must the government

---

[1] As explained herein, the Court ultimately concludes that the stop, detentions, arrests, and search of the tractor and trailer were constitutional. Thus, the Court may assume standing without the need to decide the issue definitively.

prove the evidence is not the fruit of the poisonous tree. *Id.* Consequently, even if Defendants do not have standing to contest the search of the trailer directly, they have standing to challenge the stop of the truck and the continued detention of the truck and of their persons. *See Kopp*, 45 F.3d at 1453 (concluding that, even though defendant "does not have standing under the Fourth Amendment to contest the search of the U-Haul from which the police seized the marijuana he seeks to suppress," he nevertheless, "as owner and driver of the pickup truck, unquestionably has standing to contest the stop of the truck and the continued detention of the truck and of his person"). Because the detention of Defendants was based on the lawfulness of an administrative detention, Defendants have standing to challenge their detention and arrest.

### B.       Lawfulness of Stop for Administrative Search

Inspection of a closely regulated industry is an exception to the warrant requirement. *See United States v. Vasquez-Castillo*, 258 F.3d 1207, 1210 (10th Cir. 2001). A warrantless inspection of a closely-regulated industry is constitutional if (1) there is a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made; (2) the inspection is necessary to further the regulatory scheme; and (3) the regulatory scheme, in terms of the certainty and regularity of its application, provides a constitutionally adequate notice that the commercial property owner will be subject to periodic inspections for specific purposes, notifies owners as to whom is authorized to conduct an inspection, and limits the discretion of inspectors in time, place, and scope. *See id.* at 1210-11 (citing *New York v. Burger*, 482 U.S. 691, 701-03 (1987)). The Tenth Circuit concluded that all three prongs of the *Burger* test were satisfied by the New Mexico and federal regulatory schemes governing commercial carriers. *Id.* at 1212 (holding that inspector could permissibly enter trailer to inspect the blocking and bracing).

In *United States v. Gwathney*, 465 F.3d 1133 (10th Cir. 2006), the Tenth Circuit reaffirmed

the constitutionality of the New Mexico regulatory scheme under the *Burger* test, and also held

that the officer "was justified in entering the trailer to inspect the cargo pursuant to his regulatory

duty to inspect the contents of the trailer." *Id.* at 1140 (citing N.M. Stat. Ann. § 65-5-1(F)). In so

holding, the Tenth Circuit explained: "The *Burger* criteria apply to a regulatory scheme generally,

not to the particular search at issue…. In other words, the *Burger* criteria are applied generally to

a statutory scheme, not to a given set of facts arising under that scheme." *Id.* at 1139-40 (quoting

*United States v. Maldonado*, 356 F.3d 130, 136 (1st Cir. 2004)). *See also United States v. Mitchell*,

518 F.3d 740, 751-52 (10th Cir. 2008) ("Under the established precedent of this circuit, the New

Mexico statutory scheme meets the requirements of the warrant exception set out in *Burger*.").

The analysis in *Vasquez-Castillo* and its progeny governs the resolution of this issue. Given

this circuit's repeated holdings that the New Mexico statutory scheme meets the requirements of

the warrant exception and allows officers assigned to the ports of entry to conduct regulatory

inspections of commercial tractor trailers and to enter trailers to inspect cargo, Inspector Pinto

permissibly stopped the tractor trailer pursuant to her regulatory authority.

Defendants nonetheless argue that the search was pretextual and not carefully tailored to

its underlying justification. They argue that Pinto did not adhere to standards and guidelines

limiting officer discretion. According to Defendants, Pinto failed to comply with the protocol

delineated by the North American Standard Inspection Procedure. Defendants cite the procedures

for a Level II inspection in claiming that Pinto did not follow them all:

> As a minimum, Level II Inspections must include examination of: driver's license;
> Medical Examiner's Certificate and Skill Performance Evaluation (SPE) Certificate
> (if applicable); alcohol and drugs; driver's record of duty status as required; hours
> of service; seat belt; vehicle inspection report(s) (if applicable); brake systems;
> cargo securement; coupling devices; driveline/driveshaft; exhaust systems; frames;
> fuel systems; lighting devices (headlamps, tail lamps, stop lamps, turn signals and
> lamps/flags on projecting loads); steering mechanisms; suspensions; tires; van and
> open-top trailer bodies; wheels, rims and hubs; windshield wipers; ….

CVSA, https://www.cvsa.org/inspections/all-inspection-levels/ (last visited August 4, 2021). Defendants contend that Pinto summarily bypassed several points of inspection when going too soon to the rear doors of the trailer, indicating that the stop was not carried out according to explicit, neutral limitations for a regulatory inspection, but rather to search for contraband.

An investigative detention may only last as long as necessary to effectuate the purpose of the stop. *United States v. Manjarrez*, 348 F.3d 881, 885 (10th Cir. 2003). The scope of the detention must be carefully tailored to its underlying justification. *Id.* "Even under a valid inspection regime, the administrative search cannot be pretextual." *Club Retro, LLC v. Hilton*, 568 F.3d 181, 197 (5th Cir. 2009). The Court finds that Pinto did not engage in a pretextual stop and that the scope of the detention was carefully tailored to its administrative purposes. Pinto chose the next tractor trailer in line for inspection for neutral, valid, administrative reasons. She reviewed the driver's paperwork and conducted a walk around, examining many of the requisite components in a Level II inspection. While Pinto did not examine every system listed in the Level II inspection protocols, she generally adhered to her guidelines and could enter the trailer for purposes of conducting her regulatory inspection. *Cf. Vasquez-Castillo*, 258 F.3d at 1212 ("Having found that all three prongs of the *Burger* test are satisfied by the state and federal regulatory schemes governing commercial carriers, we find that Inspector Pacheco permissibly entered Mr. Vasquez-Castillo's trailer to inspect the blocking and bracing. He was, therefore, authorized by state and federal regulations to be in the trailer when he detected the odor of marijuana and observed the other aforementioned irregularities."). The Court will therefore deny Defendants' *Motion to Suppress Evidence and Memorandum in Support Thereof* (ECF No. 40), which was based on the purported illegality of the administrative search.

**C.     Lawfulness of Prolonged Detention and Arrest**

When an officer goes beyond the limits of an investigative detention, it is only constitutional if justified by probable cause or consent. *See United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993). An arrest is characterized by a highly intrusive or lengthy search or detention. *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004). Probable cause to arrest exists only when the facts and circumstances known to the officer are sufficient to warrant a man of reasonable caution to believe that a criminal offense has been or is being committed. *Id.* Probable cause is measured against an objective standard. *Id.*

The Tenth Circuit has held repeatedly that officers have probable cause to search a vehicle based on a marijuana smell emanating from the car. *United States v. Snyder*, 793 F.3d 1241, 1244 (10th Cir. 2015) ("Our cases establish that the smell of burnt marijuana alone establishes probable cause to search a vehicle for the illegal substance."); *United States v. Downs*, 151 F.3d 1301, 1303 (10th Cir. 1998) ("In a case involving raw marijuana, this court has held that 'the odor of marijuana alone can satisfy the probable cause requirement to search a vehicle or baggage.'") (quoting *United States v. Morin*, 949 F.2d 297, 300 (10th Cir.1991)).

When Pinto said she wanted to open the trailer, Coleman began exhibiting nervousness and asked if that was necessary. Upon opening the trailer, she detected a strong odor of marijuana. When she asked if he had anything in there that he shouldn't have, Coleman replied that he did not know what was in there, he just picked up the trailer, and everything was already in there – answers that were inconsistent with the bills of lading. Other facts gave agents further grounds for believing Coleman and Jeter were both involved in drug trafficking: Coleman and Jeter were co-drivers of the truck; Coleman had access to a key to the trailer; Jeter signed for the most recent load in the trailer on 11/18/19; the bills of lading indicated Coleman and Jeter both signed for some of the contents of the trailer; and there was plastic wrap found in the equipment compartment and plastic

wrap surrounded the crates in the trailer. Upon smelling the strong odor of marijuana in the back of the trailer, law enforcement officers had probable cause to search the trailer, and upon discovery of the marijuana, to arrest Coleman and Jeter.[2] *Cf. Maryland v. Pringle*, 540 U.S. 366, 371-74 (2003) (concluding that reasonable officer could believe probable cause existed to arrest defendant for crime of possession of cocaine either solely or jointly where defendant was one of three men riding in car in which officers found cash in glove compartment and cocaine baggies in backseat armrest accessible to all men); *Vasquez-Castillo*, 258 F.3d at 1213 (finding probable cause existed to search secret compartment in trailer where inspector detected odor of raw marijuana and Coleman were, among other things, an unusually small amount of cargo, irregularities in log book and bill of lading, space between inner wall and outer hull of trailer, and a vent that appeared to serve no purpose.).[3]

Law enforcement detained Coleman and Jeter in handcuffs while they conducted a search of the tractor and trailer. The use of force during a detention, such as handcuffs, does not necessarily transform a detention into a full custodial arrest, so long as the government shows that facts known to the officer would warrant a man of reasonable caution to believe that the use of

---

[2] Notably, after agents searched the cab and trailer, agents discovered marijuana and plastic wrap in the cab that was consistent with plastic wrap in the truck, providing additional facts to support probable cause to arrest both Coleman and Jeter.

[3] The cases relied upon by Defendants to support their contrary argument are distinguishable. Unlike in *Lundstrom v. Romero*, 616 F.3d 1108 (10th Cir. 2010), Pinto smelled marijuana and observed Coleman acting nervously, reluctant to have her enter the trailer, and gave her a statement inconsistent with a bill of lading, giving her probable cause to search the trailer and to detain Coleman while she searched for marijuana. Moreover, Coleman, as the driver of the truck who acted nervously and gave inconsistent answers, is not like the passenger who did not drive the truck or have a commercial driver's license for whom the court in *United States v. Debrew*, No. CR 09-2054, 2009 WL 10675656, at *14-15 (D.N.M. 2009), found there was no probable cause to arrest. In *Debrew*, the driver had the key to the trailer, the passenger did not show nervousness or give questionable credentials or statements. *Id.* While Jeter is arguably closer to the passenger in *Debrew* than is Coleman, unlike in *Debrew*, Jeter was a co-driver of the truck and signed one of the most recent bills of lading, indicating he would have knowledge of the contents in the trailer. Finally, *United States v. Di Re*, 332 U.S. 583, 583, 593-94 (1947), is distinguishable because there an informer identified the driver as the guilty party in a counterfeit gasoline ration scheme, but he did not point out for guilt the other passenger in the car. Here, no informer gave information as to one driver, but not the other, so there was nothing to dispel suspicion that this was a joint enterprise.

handcuffs was reasonable. *See United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994). Defendants argue they were placed in handcuffs and arrested before probable cause existed to support their arrests. Probable cause, however, supported the search of the tractor and trailer at the time they were handcuffed.

Even if probable cause to arrest had not completely ripened and officers should not have detained Defendants in handcuffs before they visibly saw the marijuana (a decision this court need not reach), the marijuana and contents of the cab would have been inevitably discovered whether or not they were handcuffed. To succeed in suppressing evidence, a defendant "must show the discovery would not have come to light *but for* the government's unconstitutional conduct." *United States v. Sanchez*, 608 F.3d 685, 691 (10th Cir. 2010) (citation and quotation marks omitted) (emphasis in original). Defendants failed to show "but for" causation as there is no factual nexus between the alleged constitutional violation – the use of handcuffs – and the search of the tractor and trailer. Officers had probable cause to search the tractor and trailer prior to placing Defendants in handcuffs. Consequently, even if officers improperly detained Defendants in handcuffs prior to finding the marijuana, no evidence was discovered from any improper use of handcuffs and no evidence will be suppressed because of the use of handcuffs.

### D. Lawfulness of Statements and Consent to Search

Coleman asserts that his consent to search his phone was invalid because the prior unlawful arrest tainted his consent, because he only unlocked his cell phone and granted officers access nearly 12 hours after being held in custody. Moreover, at the hearing, counsel for Coleman elicited testimony that Coleman asked if he could call his wife and try to get a lawyer. (*See* Hr'g Tr. 164:18-165:20.) Jeter argues that officers violated *Miranda* when they continued to question him without an attorney, after he invoked his right to counsel, so his statements must be suppressed. Moreover,

he asserts that his consent to search was not voluntary under the circumstances. The Government asserts that officers advised Defendants of their *Miranda* rights and they gave express consent to search their phone to both NMSP and HSI agents. According to the United States, even though Jeter initially refused consent to search his phone, he may change his mind and the initial refusal is one factor to consider in the voluntariness inquiry. The Court will first focus on the issue of whether Defendants at any time invoked their right to counsel.

### 1.    Invocation of Right to an Attorney

A suspect who has waived his *Miranda* rights may contradict the waiver "by an invocation at any time." *Berghuis v. Thompkins*, 560 U.S. 370, 387-88 (2010). If a suspect invokes his right to remain silent at any point during questioning, "further interrogation must cease." *Id.* at 388. The Supreme Court in *Davis v. United States*, 512 U.S. 452 (1994), "held that custodial interrogation may continue unless and until a suspect actually invokes his right to counsel; ambiguous or equivocal statements that *might* be construed as invoking the right to counsel do not require the police to discontinue their questioning." *United States v. Nelson*, 450 F.3d 1201, 1212 (10th Cir. 2006) (italics in original) (citing *Davis*, 512 U.S. at 458-59). Determining whether a suspect has invoked his right to counsel is an objective inquiry in which a court looks at whether the suspect's statement is sufficiently clear that a reasonable officer would understand the statement to be a request for an attorney. *Id.* (quoting *Davis*, 512 U.S. at 459).

All questioning of a suspect subject to custodial interrogation must end once he invokes his right to an attorney, until the attorney is present, "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). *See also United States v. Giles*, 967 F.2d 382, 386 (10th Cir. 1992) ("In *Edwards*, the Supreme Court expressly held that once an accused invokes his right to counsel, all questioning

must cease until counsel is furnished, regardless of whether the accused is re-informed of his rights."). If the police subsequently initiate an encounter in the absence of counsel, the suspect's statements are presumed involuntary, even where the suspect executes a waiver. *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991).

The rigid prophylactic rule requiring all questioning to cease upon a suspect's invocation of his right to counsel "is 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights.'" *Davis*, 512 U.S. at 458 (quoting *Michigan v. Harvey*, 494 U.S. 344, 350 (1990)). A suspect's right to cut off questioning must be "scrupulously honored." *Michigan v. Mosley*, 423 U.S. 96, 104 (1975). Police may only reinitiate questioning if four conditions are met: (1) at the time the defendant invoked his right to remain silent, the questioning stopped;  (2) a substantial interval passed before the second interrogation occurred; (3) officers gave the defendant a fresh set of *Miranda* warnings; and (4) the subject of the second interrogation was unrelated to the first. *United States v. Alexander*, 447 F.3d 1290, 1294 (10th Cir. 2006) (quoting *Mosley*, 423 U.S. at 104-05). If the suspect reinitiates discussion, then his right to remain silent is not violated. *Id.*

The first step in the analysis is to determine whether the suspect invoked his Fifth Amendment right to have counsel present at questioning. *Giles*, 967 F.2d at 385. To invoke this right, the suspect must have made "some statement that can reasonably be construed to be expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." *Id.* (quoting *McNeil*, 111 S.Ct. at 2209). Whether a suspect unambiguously requested counsel is an objective inquiry. *United States v. Santistevan*, 701 F.3d 1289, 1292 (10th Cir. 2012).

A suspect's post-request responses to further interrogation may not be used to cast doubt on the clarity of his initial request for counsel. *Smith v. Illinois*, 469 U.S. 91, 92 (1984). In *Smith*,

the Supreme Court determined that the suspect's answer, "Uh, yeah, I'd like to do that," in response

to the question if he understood he had a right to consult with a lawyer and have a lawyer present

with him during questioning, was clear and unequivocal. *Id.* at 93, 95-97. As the Supreme Court

explained:

> Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease. In these circumstances, an accused's subsequent statements are relevant only to the question whether the accused waived the right he had invoked. Invocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together.
>
> … we accordingly have emphasized that a valid waiver cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation. Using an accused's subsequent responses to cast doubt on the adequacy of the initial request *itself* is even more intolerable. No authority, and no logic, permits the interrogator to proceed ... on his own terms and as if the defendant had requested nothing, in the hope that the defendant might be induced to say something casting retrospective doubt on his initial statement that he wished to speak through an attorney or not at all.

*Id.* at 98-99 (internal quotations, citations, and footnote omitted).

### a.      Whether Jeter invoked his right to an attorney

### 1)      Jeter's first discussion of right to an attorney

The first potential invocation of Jeter's right to an attorney occurred when Jeter asked, "As

far as, uh, as far as asking for a lawyer…," and Lopez replied, "Yes, that's included in those rights."

(Gov.'s Ex. 10A at 2:50-2:54.) Jeter responded, "Yes sir, um, how long, uh, is the wait for that?"

and explained that he had never been in trouble before. (*Id.* at 2:54-3:03.) Lopez then explained he

was in detention and said if he wanted to talk to him, he had a few questions, and he "can answer

'em; if you don't want to, then, you know, this is, we're done." (*Id.* at 3:38-3:51.) Lopez then

explained that Jeter may not get an attorney until tomorrow afternoon after his arraignment, he

informed him of the procedure if he got arrested or released, and Jeter said "yeah," when Lopez

asked if Jeter was "cool for talking to me?" (*Id.* at 3:50-5:00.) After clarifying if Jeter wanted to answer his questions, Jeter replied, "Yes, sir." (*Id.* at 4:55-5:00)

Whether Jeter invoked his right to counsel in this initial exchange with Lopez is a close call. The Tenth Circuit affirmed similar cases from district courts going in seemingly opposite ways on the issue. In *Giles*, the suspect asked when he would be given an opportunity to talk to an attorney and the sergeant responded that "he would be taken before a magistrate judge and if he could not afford an attorney to advise the judge so one could be appointed; otherwise he could call his own attorney at that time." *Giles*, 967 F.2d at 384. The Tenth Circuit affirmed the district court's conclusion under a not clearly erroneous standard that a suspect's question of when he would be given an opportunity to talk to an attorney could reasonably be construed as a request for an attorney. *Id.* at 385-86.

On the other hand, in the case of *United States v. Lux*, 905 F.2d 1379 (10th Cir. 1990), officers arrested a suspect in a narcotics investigation, a detective read her *Miranda* warnings, and she signed the waiver portion. *See id.* at 1381. The suspect initially answered law enforcement's questions, denying knowledge of the package's contents. *See id.* At one point, the detective hit his fist on the table, accused her of lying, and said that another suspect had been arrested and told them a different story, even though the detective knew the other suspect had not been questioned. *Id.* The suspect being interviewed "then asked how long it would take if she wanted a lawyer and if she would have to stay in jail while she waited for a lawyer." *Id.* The detective responded that "he did not know how long it would take and that she would remain in jail." *Id.* Thereafter, she changed her story and admitted to knowing the package had drugs. *Id.* The defendant argued that her admissions were not freely made because she requested an attorney, and the detective's interrogation methods overbore her free will. *See id.* at 1382. The trial court "considered whether

26

or not, during the interrogation, defendant Lux had 'requested' an attorney by asking how long it would take if she wanted a lawyer and if she would have to stay in jail while she waited for a lawyer" but "determined that Lux's questions were 'neither a clear nor equivocal invocation of her right to counsel.'" *Id.* The Tenth Circuit determined that the defendant "did not make a request for an attorney" and concluded that the trial court's findings were not clearly erroneous. *Id.*

Following *Giles* and *Lux*, the Tenth Circuit attempted to further clarify when a suspect makes an unequivocal request for counsel in *United States v. March*, 999 F.2d 456 (10th Cir. 1993). The Tenth Circuit concluded that the defendant's "statement—'Do you think I need an attorney?'—did not constitute an unequivocal request for an attorney." *Id.* at 460. It discussed cases like *Lux* in which the defendant asked how long it would take if he wanted a lawyer, and contrasted those cases from *Giles* where "the defendant asked when he would be given an opportunity to talk to an attorney," explaining that the latter was an invocation of the right to counsel while the former was not. *See id.* at 461. The Tenth Circuit explained that in *Giles*, the question evinced the desire to invoke the right, not merely a lack of understanding of the right. *Id.* It continued:

> We believe that whenever a suspect makes a statement or asks a question that appears to contemplate invocation of his right to counsel, as opposed to seeking a better understanding of what his rights are, that constitutes an equivocal invocation of the right to counsel.
>
> Such an invocation requires the interrogating officers to take appropriate action. We agree with our sister circuits that when confronted with an equivocal request for counsel, the interrogating officers must cease all substantive questioning and limit further inquiries to clarifying the subject's ambiguous statements….
>
> Here, immediately upon hearing defendant's question, the agents ceased questioning about the bank robberies, told defendant that they would stop the interrogation if he wanted an attorney, and properly answered his question by saying that it was his "call" and that they could not "advise [him] one way or the other." Only after defendant told the agents to "go ahead" did they recommence the questioning. This is the clarification required in the face of an ambiguous request

for counsel, and the district court properly denied defendant's motion to suppress his subsequently obtained confession.

*Id.* at 461-62.

*Davis v. United States*, 512 U.S. 452 (1994), also helps in determining how to resolve this issue. In *Davis*, the defendant initially agreed to speak with agents in connection with a murder investigation, but about an hour and a half into the interview, he said, "Maybe I should talk to a lawyer." *Id.* at 454-55. However, when the agents inquired if he was asking for a lawyer, he replied that he was not. *See id.* at 455. They took a short break, the agents reminded him of his rights, and the interview continued for another hour, until defendant asked to have a lawyer present before saying anything more. *Id.* The Supreme Court held that the defendant's initial statement, "Maybe I should talk to a lawyer," was not an unambiguous request for counsel, and the officers had no obligation to cease questioning him. *Id.* at 461-62. Officers are not required to ask clarifying questions regarding an ambiguous statement, although "it will often be good police practice" to do so. *Id.* at 461.

Jeter's question was ambiguous regarding his present desire for counsel. *See March*, 999 F.2d at 460-61; *Lux*, 905 F.2d at 1382. *See also United States v. Doe*, 170 F.3d 1162, 1166 (9th Cir. 1999) (concluding that suspect's question "What time will I see a lawyer?" made before interrogation began "did not invoke his right to have counsel present during interrogation"). Nevertheless, unlike the sergeant in *Giles* who did not ask further questions of the suspect at that time, here, Lopez answered Jeter's question and asked follow-up clarifying questions. Lopez discussed the next steps procedurally and then explained that if he wanted to talk to him, he had a few questions and he could answer them, but if Jeter did not want to, then, they would be done. (*See* Gov.'s Ex. 10A at 3:38-3:50.) Shortly thereafter, Lopez confirmed that Jeter was cool talking to him and wanted to answer his questions. (*See id.* at 4:48-5:02.)

Because the question about how long getting counsel would take was not a clear, express request for an attorney, the *Smith v. Illinois* holding that post-invocation statements cannot be used to cast doubt on the clarity of an initial request for counsel does not apply. The Court may therefore consider the entire exchange between Jeter and Lopez to determine whether Jeter invoked his right to counsel. *Cf. Smith*, 469 U.S. at 92. Given Jeter's question, Lopez's response, Lopez's clarifying questions, and Jeter's reply confirming that he wanted to answer Lopez's questions, this case is more like *Davis* and *March* than *Giles*. Because Lopez here ensured that Jeter did not have a present desire to speak to an attorney and end the questioning, the Court finds that Jeter did not unambiguously invoke his right to counsel in this first exchange.

Jeter additionally argues that Lopez's answer to Jeter's question about getting a lawyer the next day was deceitful and made the *Miranda* warnings inadequate. The "Miranda Warning Notice" Jeter signed clearly explained that he had the right to remain silent and to have a lawyer present with him during questioning. (Gov.'s Ex. 7B.) Nevertheless, Jeter asserts that Lopez supplied misinformation that deprived him of his *Miranda* rights, because the agent's statement incorrectly said he could not get a lawyer until the next day, and thus, prevented him from the continuous opportunity to obtain counsel. *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966) (explaining that suspect "has the right to the presence of an attorney" during questioning).

In arguing that the *Miranda* warnings were insufficient, so he could not be deemed to have waived them, Jeter relies on *United States v. Tillman*, 963 F.2d 137 (6th Cir. 1992). *Tillman*, however, is distinguishable because, there, officers only gave a shortened version of *Miranda* warnings and never told the defendant any statements he would make could be used against him. *See id.* at 140-41. Here, Jeter signed a *Miranda* waiver with his rights accurately stated.

More on point is the case of *Duckworth v. Eagan*, 492 U.S. 195 (1989). In *Duckworth*,

officers gave all the *Miranda* warnings but "added that they could not provide respondent with a lawyer, but that one would be appointed 'if and when you go to court.'" *Id.* at 203. "The Court of Appeals thought this 'if and when you go to court' language suggested that 'only those accused who can afford an attorney have the right to have one present before answering any questions,' and 'implie[d] that if the accused does not 'go to court,' *i.e.*[,] the government does not file charges, the accused is not entitled to [counsel] at all.'" *Id.* (quoting 843 F.2d 1554, 1557 (7th Cir. 1988)). The Supreme Court disagreed because the instruction accurately described the procedure for the appointment of counsel under Indiana law and that if "the police cannot provide appointed counsel, *Miranda* requires only that the police not question a suspect unless he waives his right to counsel." *Id.* at 204. Likewise, Lopez indicated that if Jeter wanted counsel, one would be provided to him in court, likely the next day, and that Jeter did not have to speak with Lopez if he did not want to do so at that time. Based on *Duckworth*, the *Miranda* warnings given to Jeter were sufficient and Lopez's statements did not misinform Jeter of his rights.

For the foregoing reasons, the Court finds that Jeter did not clearly and unambiguously invoke his right to counsel when he asked Lopez how long the wait was for a lawyer.

### 2)    Second time Jeter discusses an attorney

Later in the same interview, one of the agents asked Jeter if he would mind if they checked his phone. (Gov.'s Ex. 10A at 36:02-36:08.) Jeter replied, "Nah, I got you. Uh, I wouldn't mind. I mean, as far as, uh, as far as, uh, a lawyer being around, so I don't you know. 'Cause I know I'm saying a lot of stuff. And I don't wanna…" (*Id.* at 36:08-36:16.) The agent told him that was up to him and that he would not search it illegally. (*See id.* at 36:18-:21.) A few minutes later, agents sought to clarify that Jeter said they could not look into his phone without a lawyer, and Jeter responded, "Yes, sir." (*Id.* at 40:56-41:02.)

Jeter argues that he requested a lawyer in this exchange; however, his words appear to limit the request for a lawyer to only if the agents were searching his phone. Consequently, Jeter did not give consent to search his phone, and the agents understood that he would not give them consent to search unless a lawyer was present. It is not clear, though, that Jeter invoked his right to counsel and did not want to speak with agents anymore without counsel present. Agents therefore could reasonably continue their interview with Jeter at this time.

That said, agents did not scrupulously honor Jeter's request to have counsel present during a search of his phone. They later continued to ask him if they could search his phone despite his clear request for counsel should they do so. Accordingly, the consent to search Jeter's phone that agents subsequently received is tainted by the failure of the agents to honor his limited invocation of counsel for the purposes of having counsel's help during any phone search.

### 3)     Third time Jeter brings up counsel

Agents interviewed Jeter again around 11:30 p.m. and about 15 minutes into this interview, Jeter said he told them everything that they wanted to know, and that "if you don't believe me, that's fine, … I'd rather just have a lawyer if y'all don't believe me, like, you can sit here and check the drive time…." (Gov.'s Ex. 13A at 15:39-15:49.) This latter invocation is a clearer expression of a desire to have the assistance of an attorney. Nonetheless, the agents continued the interview without acknowledging the request for counsel or honoring this request. According to the Government, Jeter did not expressly invoke his right to an attorney because it "was conditioned on whether the officers believed or disbelieved his story." (Gov.'s Resp. 24, ECF No. 76.) It cites *United States v. Sierra-Estrada* in support.

"[S]tatements contemplating the invocation of the right to counsel are not sufficient to actually invoke the right to counsel." *United States v. Sierra-Estrada*, 248 F. App'x 973, 981 (10th

Cir. Oct. 1, 2007) (unpublished) (citing cases holding statements like "I might want to talk to an attorney" and "I think I need a lawyer" were not clear invocations). "Rather, to invoke the right to counsel, a statement must contain 'the clear implication of a present desire to consult with counsel.'" *Id.* (quoting *Lord v. Duckworth*, 29 F.3d 1216, 1221 (7th Cir. 1994)). In *Sierra-Estrada*, the Tenth Circuit concluded that the suspect's statement, "I wonder if I could have a lawyer. Is it possible if I don't have money?" was not a clear invocation of his right to counsel. *Id.* The Tenth Circuit noted the suspect's failure to request counsel or stop the interview after the agents explained that he would have an attorney as soon as he asked for one. *Id.*

In contrast to cases finding ambiguity, Jeter's third statement did not use "might" or "I think" or "I wonder." He did not ask a question about the process for getting an attorney. Instead, he said he would rather just have an attorney, which expresses a present desire to consult with counsel. Even if this Court accepted the Government's argument that Jeter's additional statement, "if y'all don't believe me," made his desire for counsel somewhat contingent, it does not create ambiguity in this case, because the agents were at that time expressing their disbelief in what Jeter was telling them, so any contingency was occurring. Jeter therefore clearly invoked his right to counsel when he said, "I'd rather just have a lawyer if y'all don't believe me." Consequently, Jeter's statements made after this invocation of the right to counsel must be suppressed as fruit of the poisonous tree.

### b.      Whether Coleman invoked his right to an attorney

After Griego read Coleman his *Miranda* rights and informed him of what potential charges may follow, Coleman stated: "Let me ask you a question. Can I … can I call my wife and try to get a lawyer or something because I'm just trying to figure out why you're gonna charge me when … I can see if I had it on me on my person but I didn't have it on me … you can talk to the shipper,

that's who put it on there, not me." (Gov.'s Ex. 7A at 2:48-3:05.) Although agents did not formally interview him at that time, Griego ignored his question whether he could call his wife to get a lawyer. Coleman did not frame is inquiry using terms like "I might," "I wonder," or "maybe." Coleman's question indicated he wanted to get a lawyer. While he posed his desire as a question rather than stating he wanted to try to get a lawyer, he was nevertheless not musing aloud about how long it would take to get a lawyer or pondering whether he should get one. Instead, he asked the agent for the means to get a lawyer – to call his wife to try to get a lawyer. This question thus expressed a present desire to get an attorney that was not scrupulously honored. *See March*, 999 F.2d at 460 (citing *Robinson v. Borg*, 918 F.2d 1387, 1391 (9th Cir.1990), *cert. denied*, 502 U.S. 868, 112 S.Ct. 198, 116 L.Ed.2d 158 (1991), as a case involving a much clearer demand and unequivocal request for counsel where the suspect said, "I have to get me a good lawyer, man. Can I make a phone call?").

The next issue is whether Lopez could reinitiate questioning. Turning to the four conditions for this inquiry, the first condition is whether at the time the defendant invoked his right to counsel, questioning stopped. That factor appears to be satisfied, because at the time Griego gave Coleman the *Miranda* warnings, agents did not seem ready to engage in a formal interview. The remaining conditions, however, demonstrate that law enforcement should not have resumed questioning. As for the second condition, approximately five hours transpired between Coleman's invocation and Lopez's questioning, but the Court is not convinced that this amount of time is "substantial," especially where Coleman remained in custody the entire time. With respect to the third condition, Lopez asked if Coleman understood his rights, but did not give him a fresh set of *Miranda* warnings. Lastly, the subject of the second interrogation was related to the first. Weighing these four factors, NMSP agents should not have reinitiated questioning of Coleman and should have

honored his request to try to contact an attorney.

### c.      Whether federal agents could re-initiate questioning

When agents transferred Coleman and Jeter to federal custody, HSI agents gave them a fresh set of *Miranda* warnings, satisfying the third factor set forth in *Alexander*. However, when Coleman and Jeter earlier invoked their right to counsel with state agents, questioning did not altogether cease. They had been in continuous custody for approximately 12 hours. The subject matter of the state and federal interviews was the same. Accordingly, the Court finds that federal agents also could not reinitiate questioning of Coleman after he invoked his right to counsel. Consequently, the Court will suppress Coleman's statements to law enforcement following his invocation of counsel. The Court likewise finds Coleman's consent to search his phone invalid because it was given after agents failed to scrupulously honor his right to counsel.

As for Jeter, he invoked his *Miranda* rights with federal agents, but consented to a search of his phone and gave them his passcode. The Court finds Jeter's consent invalid and his statements regarding his passcode should be suppressed because of the failure of agents to scrupulously honor his right to counsel. The federal investigation was not sufficiently removed from the state investigation to purge the taint.

### E.      Voluntariness of Jeter's and Coleman's Statements Prior to Invocation

Jeter made numerous statements to law enforcement prior to the time he clearly and unequivocally invoked counsel, so the Court must determine if those statements were voluntary. Coleman made fewer statements before his invocation of counsel, but the Court will examine the voluntariness of his pre-invocation statements as well.

The test of voluntariness is based on the totality of the circumstances, considering both the characteristics of the defendant and the details of the interrogation. *Schneckloth v. Bustamonte*,

412 U.S. 218, 226 (1976); *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006). The court must determine whether the defendant's confession is the product of an essentially free and unconstrained choice or if his will was overborne by physical or psychological coercion, threats, or by improper inducement. *See Lopez*, 437 F.3d at 1063; *United States v. Erving L.*, 147 F.3d 1240, 1248-49 (10th Cir. 1998). A court looks to coercive police activity, express or implied. *Schneckloth*, 412 U.S. at 227.

No single factor is determinative in the voluntariness inquiry. *Lopez*, 437 F.3d at 1063. Relevant factors include: (1) the suspect's age, education, and intelligence; (2) whether the suspect has been arrested and given *Miranda* warnings on earlier occasions, indicating previous experience with the criminal justice system; (3) the length of the detention and questioning; (4) the nature of the detention and questioning, such as whether threats or promises of leniency were made; (5) any advice of a suspect's constitutional rights; (6) the use of physical punishment; and (7) whether the suspect confessed to the crime or consistently denied any involvement in the crimes throughout the interview. *See Schneckloth*, 412 U.S. at 226; *Lopez*, 437 F.3d at 1063-65; *United States v. Chalan*, 812 F.2d 1302, 1307-08 (10th Cir. 1987).

Jeter was 24 years old at the time of his statements and he had no prior criminal history, which he told the officers. Jeter was initially read, and he signed, his *Miranda* rights. Later, Lopez asked if Jeter remembered having his rights read by another officer and if he understood them, and Jeter said he did. The length of the detention was hours long and extended into the wee hours of the morning, but the questioning itself was not unduly long. The nature of the questioning was also largely cordial, and no threats were made against him. An agent's suggestion that Coleman might be thinking Jeter could take the fall for the drugs because he might only get probation does not constitute a promise of leniency and was not unduly coercive. The statement was too vague and

non-committal to constitute a promise of leniency. *Cf. Lopez*, 437 F.3d at 1064-65 (finding promise of leniency was not vague where agent used terms "mistake," "murder," "6," and "60," to promise suspect he would spend fifty-four fewer years in prison if he would confess to killing). Officers did not use physical punishment or display weapons, and Jeter never confessed and consistently denied any involvement in the crimes throughout the interview. Consequently, the statements he made up to the point he clearly expressed a desire for counsel are voluntary and will not be suppressed.

Coleman's statements pre-invocation similarly should not be suppressed, as they were not coerced and were freely given. Coleman is older than Jeter and had more familiarity with the criminal justice system. While Coleman's detention was hours long before he invoked his right to counsel, questioning was not unduly long, no promises of leniency were made to him, and no physical punishment or weapons were used. Coleman consistently denied involvement in the crimes. These factors demonstrate his statements up to his invocation of his right to counsel were voluntary.

### F.   Inevitable Discovery

Evidence may be suppressed that is "fruit of the poisonous tree," in other words, evidence discovered as a direct result of unlawful activity. *United States v. Olivares-Rangel*, 458 F.3d 1104, 1108-09 (10th Cir. 2006). "The Government can establish that a particular item of evidence has been purged of the primary taint by demonstrating that the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct." *Id.* at 1109. The United States argues that, even if there are issues with Coleman's and Jeter's consent to search their phones, the information on the cell phones would have been inevitably discovered through search warrants.

"In cases like this one, where the theory of inevitable discovery is that a warrant would have been obtained but for the illegal search, the district court must determine 'how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to the warrant.'" *United States v. Christy*, 739 F.3d 534, 541 (10th Cir. 2014) (quoting *United States v. Souza*, 223 F.3d 1197, 1204 (10th Cir. 2000)). Four factors aid in this determination:

> the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli.

*Id.* (quoting *Souza*, 223 F.3d at 1204). Factors 1 and 3 are particularly important. *Id.* The government bears the burden of proving by a preponderance of the evidence that it would have discovered it through lawful means. *United States v. Loera*, 923 F.3d 907, 928 (10th Cir. 2019). A court should only apply this doctrine when it has a high level of confidence that a warrant would have issued, and the evidence thereby would have been obtained. *Christy*, 739 F.3d at 541-42.

The Tenth Circuit does not require a separate investigation for the doctrine to apply; instead, "the inevitable discovery doctrine will apply if there was one line of investigation that would have led inevitably to the obtaining of a search warrant by independent lawful means but was halted prematurely by a search subsequently contended to be illegal." *Loera*, 923 F.3d at 928 (internal quotations omitted). "The key to applying this doctrine is to place the government officers in the 'same positions they would have been in had the impermissible conduct not taken place,' and, from that vantage point, to ask whether the government would have inevitably discovered the evidence lawfully." *Id.* (quoting *Nix v. Williams*, 467 U.S. 431, 447 (1984)).

Turning to the first and third factors, there is some evidence suggesting that NMSP agents intended to get a warrant, as they asked Defendants to unlock the phones to turn them off in

preparation for seizing them and getting a warrant. However, federal agents took over the investigation shortly thereafter, and neither agency ever started a warrant process for the phones or for any other evidence. Consequently, no agency obtained a warrant for the phones or any other item of evidence even after the phones were seized.

As for the second factor, the officers had probable cause to believe Coleman and Jeter were involved in drug trafficking for the reasons given herein. That Jeter had two cell phones, in addition to having signed the bill of lading for the more recent shipment of goods, is further evidence suggesting his cell phones would contain evidence of the crime. Moreover, the GPS information on the phones would be relevant to the crime of distribution to determine where they had recently traveled in the truck. Thus, there was sufficient probable cause to believe that a magistrate judge would have issued a warrant if one were sought. Probable cause alone, however, is not sufficient to justify application of the inevitable discovery doctrine. *United States v. Blackburn*, 785 F. App'x 539, 544 (10th Cir. Aug. 23, 2019) (unpublished decision) (citing *Christy*, 739 F.3d at 543).

As for the fourth factor, the Court finds that agents did not jump the gun because they lacked confidence in their showing of probable cause. Although agents never began the warrant process, the Court credits the testimony of Special Agent Avila and finds that the typical protocol in drug trafficking cases like this one is for federal agents to obtain a warrant to search cell phones of drug trafficking suspects if they do not consent to a search of the phones. The federal agents believed they had valid consent to search the phones and do not appear to have been aware that Coleman and Jeter requested the assistance of counsel while being interviewed by state agents. The reason federal agents did not get a warrant is that they believed they had valid consent to search the phones, not that they did not have probable cause. The fourth factor thus weighs in favor of the Government.

The United States relies on *Blackburn* in support of its position that the inevitable discovery doctrine should apply in this case. In *Blackburn*, the Tenth Circuit upheld application of the doctrine where officers had probable cause to believe that the defendant was the person in possession of child pornography images, even though they searched the phone before taking any steps to get a warrant. *See id.* The Tenth Circuit relied on the facts that law enforcement ultimately obtained warrants to search the residence, they took measures to secure the residence while they waited, and they did not do any other searches until they had the warrants. *See id.* Other relevant facts included that law enforcement did not jump the gun where they first sought the suspect's consent to search the phone, and "after conducting a protective sweep, officers did not search any other portion of Blackburn's home or belongings before the warrants were approved." *Id.*

*Blackburn*, however, is of limited utility because officers there ultimately got a warrant. While *Blackburn* helps the Government in that the warrant process does not need to have begun for the inevitable discovery doctrine to apply, it is distinguishable because the third *Christy* factor – officers ultimately obtained a warrant – is missing in this case.

Other cases, however, indicate that the inevitable discovery doctrine may apply even if no warrant was sought or obtained. In *United States v. Pelletier*, agents searched the suspect's computer for pornography after he told them he had child pornography on his computer for research purposes and after he ultimately consented to the search of his computer. *See* 700 F.3d 1109, 1112-13 (7th Cir. 2012). After the suspect initially refused consent, the agent directed another agent to freeze the premises pending a search warrant and contacted an Assistant United States Attorney and state law enforcement authorities about obtaining a search warrant. *Id.* at 1113, 1117. The agent did not otherwise start the process to get a warrant because the suspect relented and consented to the search. *See id.* at 1113. After analyzing these facts, the Seventh Circuit

concluded there was probable cause to support a warrant and that the government would have obtained a warrant. *Id.* at 1117. As the Seventh Circuit explained:

> Our case law establishes that the inevitable discovery rule applies ... where investigating officers undoubtedly would have followed routine, established steps resulting in the issuance of a warrant. The government is not required to show that investigators *in fact* obtained or sought a warrant in order to prove that they *inevitably would have* done so. Rather, the government need only show that [i]t would be unreasonable to conclude that, after discovering all of [the] information, the officers would have failed to seek a warrant.
>
> The government's case on this point was compelling. It is unreasonable to think that, after Pelletier admitted to two FBI agents that he had child pornography, the FBI would have failed to follow up and obtain a search warrant. That fact alone is enough for the inevitable discovery doctrine to apply.

*Id.* (internal quotations and citations omitted, italics emphasis in original).

In *Pelletier*, unlike here, the agent had reached out to authorities about getting a warrant. Nevertheless, the Seventh Circuit stated that the only fact it needed to rely on to reach its conclusion was that it was unreasonable to think that, after discovering all the information, officers would have failed to seek a warrant. *See id.*

In this case, state agents turned off the cell phones, telling Defendants that they would get warrants to search the phones. Special Agent Avila testified that the high 90% of cases in which he has participated involve the seizure and/or search of an electronic device, and that had Coleman or Jeter not filled out the consent forms, the next step for Avila would have been to tell the case agent, and the case agent would have applied for a warrant to search the phones. Of significance, the standard HSI protocol for drug trafficking investigations is, if a suspect refuses to sign the consent to search form for his phone, the next steps are to submit a warrant for the phone to a judge, and then if approved, to search the phone. Federal agents knew at the time the case was turned over to them that there was a large quantity of marijuana found in the back of the trailer; there was a small quantity of marijuana found in the cab; plastic wrap found in the cab matched

that in the trailer; Coleman became nervous when Pinto wanted to search the trailer; he gave answers inconsistent with the bills of lading when Pinto opened the trailer and could smell its contents; Coleman and Jeter both signed for contents in the trailer; and Jeter had two cell phones. The Court finds that it would be unreasonable to conclude that, after discovering all of that information, and given the standard protocols of the HSI agents, the agents would have failed to seek a warrant if Coleman and Jeter refused to consent to the search of their phones. Under the reasoning of *Pelletier*, the inevitable discovery doctrine should apply here because the agents could and would have gotten a warrant had Defendants not signed consent to search forms.

Although the Court finds the reasoning of *Pelletier* helpful and on point, the next question is whether the Tenth Circuit would apply similar reasoning in cases where the agents never obtained a warrant and did not start the warrant process. The closest case the Court found in this circuit with a similar fact pattern is the unpublished decision in *United States v. Alabi*, 597 F. App'x 991 (10th Cir. Jan. 20, 2015). There, the Tenth Circuit assumed, without deciding, the officers' actions in extracting the contents of credit cards' magnetic strips without a warrant constituted an illegal search, but it determined that the information agents obtained was admissible under the inevitable discovery doctrine. *See id.* at 997-98. It so ruled despite the government's concession that agents had not begun the process of obtaining a warrant when they examined the credit cards. *Id.* at 999. Nevertheless, the *Alabi* court explained that the first factor "is relevant, in part, because it informs the determination of whether the evidence at issue would have remained in place and intact while law enforcement secured the warrant, thus increasing the likelihood of its discovery." *Id.* That the agents had not begun the warrant process was not dispositive; instead, the Tenth Circuit reasoned that the first factor only weighed slightly against application of the inevitable discovery doctrine because "the credit cards were safely in police custody when agents

41

examined them." *Id.*

After concluding that probable cause was strong enough that a magistrate judge could have and would have issued a warrant, the Tenth Circuit considered the importance of the fact that agents ultimately got a warrant, but for electronics rather than the cards' magnetic strips. *Id.* It explained that "the government provides no authority suggesting the third factor is satisfied if law enforcement simply obtains *any* warrant, rather than a warrant for the evidence it argues would have been inevitably discovered," but noted that "the fact the agents ultimately sought and obtained a search warrant for closely related items suggests they would have included the cards in their application had they not already examined them." *Id.* at 999-1000. Accordingly, it determined that the third factor did not fully weigh in favor of the government but that it was likely the agents would have procured a warrant for the credit cards. *Id.* at 1000. Finding also that the agents did not lack confidence in their probable cause showing, the Tenth Circuit held that the factors weighed in favor of applying the inevitable discovery exception. *Id.*

While *Alabi* is not exactly on point because agents there procured a warrant for other items, it emphasizes the importance of facts showing the likelihood agents would have discovered evidence pursuant to a valid warrant, facts the Seventh Circuit in *Pelletier* also deemed significant to the analysis. Applying *Alabi*'s analysis of the first factor to these facts, that state agents turned off and secured the cell phones for the stated reason of getting a search warrant somewhat mitigates law enforcement's failure to begin the process of obtaining a warrant, because the cell phone evidence would have remained secured and intact if federal agents sought a warrant.

Jeter nevertheless asserts that the Government has not shown that they would have been able to crack the passcodes for each phone, even if they ultimately received a warrant. Jeter points out that their statements giving agents the passcodes should be suppressed because of the

42

constitutional violation, and any evidence obtained from those statements is fruit of the poisonous tree. Indeed, Jeter and Coleman both gave their passcodes to the agents after they invoked their rights to counsel, so the Government would not have had the passcodes without the constitutional violation. Could the Government have inevitably discovered the contents of the phones without the passcodes? The only testimony on this issue at the hearing was from Avila: "If we get the warrant, then the Galaxy ones are much easier for our software to get into than the iPhones in this case." (Hr'g Tr. 254:7-9.) This testimony indicates that HSI's software likely would have accessed the contents of the Galaxy phone. The likelihood that federal agents would have and could have discovered the contents of the Galaxy cell phone evidence pursuant to a valid warrant is high given HSI's standard procedure for drug trafficking cases to procure a warrant to search cell phones of drug trafficking suspects in the absence of obtaining their consent to search. For all the foregoing reasons, the Court will not suppress evidence derived from Jeter's Galaxy cell phone. *Cf. United States v. Orozco Ramirez*, 1:17-cr-185-LMM-AJB-01, 2019 WL 2165920, *9 n.10 (N.D. Ga. April 22, 2019), *report and recommendation adopted by* 2018 WL 8337421 (N.D. Ga. 2019) (concluding that government would have inevitably discovered cell phone evidence, even though when it first came into possession of cell phone, software necessary for the search was not available, because updated software tools became available within several months); *United States v. Todd*, CR 416-305, 2017 WL 1197849, *13 (S.D. Ga. Feb. 10, 2017), *report and recommendation adopted by* 2017 WL 1172113 (S.D. Ga. 2017) (refusing to suppress contents of cell phone, despite court's suppression of fact that defendant disclosed swipe pattern for phone, under inevitable discovery doctrine, where agent testified that FBI had technological capabilities to bypass swipe pattern and access contents of phone); *United States v. Will*, Cr. No. 5:15-CR-6, 2015 WL 3822599, *16 (N.D. W. Va. June 19, 2015) (suppression not warranted under doctrine

of inevitable discovery where evidence demonstrated content of phone would and could have been extracted without password).

As for the iPhones, however, the record does not establish that agents had a high likelihood of discovering the contents of those phones without the unlawfully obtained passcodes. The Government has the burden of proving the factual basis for the inevitable discovery doctrine and it has not done so for the iPhones. The Court will therefore suppress the contents of Defendants' iPhones based on the fruit of the poisonous tree doctrine.

**IT IS THEREFORE ORDERED** that

1. Defendant Coleman's *Motion to Suppress Evidence Derived from a Telephone "Dump" of his Cellular Telephone and Statements and Memorandum in Support Thereof* (**ECF No. 39**) is **GRANTED** as to Coleman's statements to law enforcement made after he invoked his right to counsel and as to the contents of his iPhone, but is otherwise **DENIED**.

2. Defendants' *Motion to Suppress Evidence and Memorandum in Support Thereof* (**ECF No. 40**) is **DENIED**.

3. Defendant Jeter's *Motion to Suppress Evidence Derived from his Unlawful Arrest, the Subsequent Violation of his* Miranda *Rights and from an Illegal Seizure of his Cellular Telephone* (**ECF No. 68**) is **GRANTED** as to Jeter's statements to law enforcement made after he clearly invoked his right to counsel and as to the contents of his iPhone, but is otherwise **DENIED**.

**SENIOR UNITED STATES DISTRICT JUDGE**